OPINION
{¶ 1} Defendant-appellant RAM Products, Inc. appeals from the July 12, 2004, Judgment Entry of the Guernsey County Court of Common Pleas granting judgment in favor of plaintiff-appellee Phillip Rich and against defendant-appellant in the amount of $25,000.00 plus interest.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On November 21, 2002, appellee Philip Rich filed a complaint against appellant in the Guernsey County Court of Common Pleas for breach of a bailment contract. Appellee, in his complaint, alleged that appellant breached its contract with appellee to refurbish and sell specified equipment, that appellant, as bailee of such equipment, owed a duty to appellee to "safely keep said equipment in a safe condition," and that appellant breached the bailment. Appellee further alleged that appellant converted the equipment to its own use. In his complaint, appellee specifically sought compensatory damages of more than $25,000.00 and punitive damages.
 {¶ 3} Subsequently, a bench trial was held on June 30, 2004. The following testimony was adduced at trial.
 {¶ 4} For approximately 15 years, appellee owned a company that was in the tile business and then converted over to making crock pots. After leaving such business, appellee bought and sold different pieces of equipment that are used in manufacturing pottery. Appellee stored such equipment in a steel barn storage facility.
 {¶ 5} In January of 1994, appellee purchased two 60 or 90 ton RAM presses, with three hydraulic units and tanks, and a "RAM made jigger machine" from Nelson-McCoy Pottery in Roseville, Ohio, for $10,000.00 each. Transcript at 12. Appellee paid for the three pieces of equipment, all of which appellee was told were in working condition at the time of purchase, with three $10,000.00 checks made out to cash delivered to Ralph Portal, the owner of Nelson-McCoy. Appellee arranged for the equipment to be transported to an enclosed, weather-proof pole storage building where, according to appellee, the equipment was stored on the sawdust floor on pallets.
 {¶ 6} Appellee, who had bought and sold other presses while in the pottery business, decided to sell the three pieces of equipment. For such reason, in 1998, appellee contacted appellant, the original manufacturer of the RAM presses, about selling the equipment for him. Appellee had been a customer of appellant. Appellee talked to Richard Pelleriti, appellant's then CEO, about taking the equipment to appellant's plant in Columbus, Ohio, refurbishing the equipment, if necessary, and then selling the same and splitting the proceeds. Appellant then picked up the presses from appellee's storage facility. The equipment was loaded onto a truck using an 8,000 pound forklift operated by Lynn Hall, who worked for appellee as a handyman/repairman. Hall testified that the two presses "looked real good" at the time they were loaded. Transcript at 73. The parties agreed that if the equipment did not sell, it was to be returned to appellee.
 {¶ 7} After the equipment did not sell, appellee went to appellant's facility in Columbus, Ohio, on August 2, 2002, to pick up the equipment and bring the same back to his own facility. According to appellee, "[i[t had been stored all that time in an open shed that had the rain and snow and everything else had been on it and the equipment was absolutely ruined." Transcript at 25. All of the three tanks were missing as were the motors. At trial, Lynn Hall testified that the equipment was not usable or merchantable. Appellee, who has bought and sold a number of presses over a 30 year period, testified that the value of the hydraulic tanks was $5,000.00 each. When questioned about the value of the presses, appellee testified as follows:
 {¶ 8} "A. Well, currently those units are selling for about $40,000.00 maybe more depending on accessories you might have with them.
 {¶ 9} "Q. Now, that's each press, right?
 {¶ 10} "A. That is correct.
 {¶ 11} "Q. Would that be a new press?
 {¶ 12} "A. That would be correct.
 {¶ 13} "Q. How about a reconditioned press?
 {¶ 14} "A. Well, it depends I would say on how good they are. They now will sell from probably an average about 20, $25,000.00 each." Transcript at 36.
 {¶ 15} At trial, Ron Little, who was the maintenance superintendent at Nelson-McCoy, testified that the equipment had been sold to appellee in working condition.
 {¶ 16} Richard Pelleriti, who was appellant's CEO, testified that appellee called him in 1998 after hearing that appellant was selling some presses and that appellee "told me he had some in a barn over in Cambridge and wanted me to come over and take a look at them . . ." Transcript at 101. Pelleriti testified that he told appellee that appellant was interested in 90 ton presses to refurbish and that appellee told him that he had 90 ton units. However, when appellant arrived at appellee's facility to pick up 90 ton presses and to "pay him [appellee] $3,500.00 a piece for them," there were no 90 ton presses. Transcript at 103. Pelleriti testified as follows when asked what his agreement with appellee was regarding the equipment that was in appellee's storage facility:
 {¶ 17} "A. Well, when I found no 90 ton presses and we had something else to consider and we had no market for 60 ton presses as far as I was concerned we had no agreement at that point in time. I told him I'd take them over there, we'd take a look at them and see what we could do. I knew we had some 60 ton presses at RAM that we were refurbishing. We could put these in line and tear them apart as we had time and if we had orders we might be able to do something with them." Transcript at 105-106.
 {¶ 18} According to Pelleriti, the presses in appellee's storage facility, which weighed around 7,000 and 8,000 pounds, were not on pallets, but were on a dirt and sawdust floor. Pelleriti further testified that the press that was sitting out on a trailer in the parking lot at the time of trial was substantially in the same shape as when it was picked up from appellee's facility, although the pumping unit was different, and that a jigger picked up from appellee's facility in 1998 was in substantially the same shape when being taken from appellant's facility by appellee in 1998, "except that there was probably a pumping unit with it." Transcript at 109. When asked, Pelleriti testified that he stored all of appellee's equipment in the same manner as appellant's own equipment, which was on a concrete floor under a roof. After being asked whether the equipment that was returned to appellee was in substantially the same condition as when it was picked up, Pelleriti responded in the affirmative. While Pelleriti testified that the equipment was "junk" when picked up from appellee's facility, he testified that he took such equipment to Columbus to strip, remanufacture and sell the same.
 {¶ 19} At trial, Pelleriti testified that, at around the same time that appellee bought the presses from Nelson-McCoy, appellant bought three 90 ton presses from Nelson-McCoy for $18,000.00.
 {¶ 20} When asked whether the tanks and hydraulics were on the units when they were returned to appellee, Pelleriti testified as follows:
 {¶ 21} "There had been some refurbishing started and now I wasn't there when he picked up the equipment but in starting the refurbishing we had taken all the components off. We had some presses of ours that we were refurbishing so we did them at the same time and the way we were doing it was when we didn't have I'm going to call it productive work in the shop we would start tearing apart these presses or the pumping units and part of that what we would do is take all of those obsolete components off and scrap them, we would sandblast the frames and the die sets and also the pumping units because they had old oil in them and they were greasy and then sandblasting. Mr. Rich kept referring to the lack of serial numbers. There are serial numbers on those presses when we make them but when they're refurbished they get blanched or ground and those numbers get ground off and so that's why he can't find any serial numbers on the ones he had that we started the refurbishing process on." Transcript at 116-117.
 {¶ 22} John Pelleriti, appellant's President since 1986, also testified at trial. John Pelleriti testified that appellant could not have sold the equipment that was picked up at appellee's in the condition that it was received and that such equipment was worth between $4,000.00 and $5,000.00 upon receipt. John Pelleriti further testified that appellant did not sell anything of appellee's for a profit and that appellant started refurbishing appellee's presses by sandblasting and striping off all identifying serial numbers. According to John Pelleriti, appellant used parts of appellee's equipment to refurbish appellant's own equipment and scrapped parts of appellee's equipment. Appellant also commingled appellee's equipment.
 {¶ 23} Both parties testified that some of the equipment appellee picked up from appellant on August 2, 2002, was not the same equipment that appellant received from appellee in 1998.
 {¶ 24} Pursuant to a Judgment Entry filed on July 12, 2004, the trial court concluded that appellant had failed to redeliver the bailed goods to appellee "in the condition in which they were at the time they were received" by appellant and granted judgment in favor of appellee and against appellant in the amount of $25,000.00 plus interest. The trial court, in its entry, specifically found that the value of the equipment at the time of delivery to appellant was $30,000.00 and that the value of the same when redelivered to appellee was $5,000.00. On such basis, the trial court concluded that appellee had established damages in the amount of $25,000.00.
 {¶ 25} It is from the trial court's July 12, 2004, Judgment Entry that appellant now appeals, raising the following assignment of error:
 {¶ 26} "The trial court erred in its computation of damages by assigning a thirty thousand dollar ($30,000) valuation to plaintiff's equipment because it did not follow the correct formula in determining this value, which resulted in placing plaintiff in a much better position than plaintiff would have been if defendant would have returned plaintiff's equipment in the same condition that defendant had received it."
 I {¶ 27} Appellant, in its sole assignment of error, argues that the trial court erred in awarding $25,000.00 in damages to appellee. Appellant specifically contends that the trial court erred in computing damages by assigning a $30,000.00 value to appellee's equipment "because it did not follow the correct formula in determining this value." We disagree.
 {¶ 28} The parties in the case sub judice do not dispute that there was a bailment contract between appellant and appellee. Under the law of bailments, the bailor (in this case, appellee) has a right to a return of the property unchanged upon the termination of the bailment. Maloney v.General Tire Sales (1973), 34 Ohio App.2d 177, 296 N.E.2d 831. In the event the bailed article is damaged as a result of the bailee's conversion, the measure of damages is the difference between the value of the property immediately before and the value immediately after it was damaged. Maloney, supra.
 {¶ 29} The trial court, in its July 12, 2004, Judgment Entry, made the following conclusions of law:
 {¶ 30} "The Court further concludes that the value of the equipment Plaintiff received back from the Defendant was worth $5,000.00.
 {¶ 31} "10. The Court concludes as a matter of law that the Defendant bailee failed to `refurbish' and sell Plaintiff's equipment which it received in 1998 or to redeliver it to the Plaintiff in the same condition.
 {¶ 32} "The Court concludes the only value of the equipment which can be used by the Court, as the equipment was not refurbished, is the value of the goods when Plaintiff purchased them. Plaintiff paid $30,000.00 for the three (3) presses and associated equipment. Therefore, the value of the goods to the Plaintiff at the time of the delivery to the Defendant was $30,000.00.
 {¶ 33} "The Court further concludes that if Defendant had redelivered the goods to the Plaintiff in the same condition, there would have been no loss or damage to Plaintiff. However, the Court has found the value of the goods received back from the Defendant by the Plaintiff is $5,000.00.
 {¶ 34} "The Court therefore concludes Plaintiff has established by preponderance of the evidence damages to his goods by the Defendant of $25,000.00."
 {¶ 35} As is stated above, at the trial in this matter, testimony was adduced that appellee purchased the two presses and jigger machine in January of 1994 for a total purchase price of $30,000.00. Testimony also was adduced that appellee was experienced in buying and selling the same type of presses and that, when appellee purchased the presses and jigger machine, they were in working condition. Furthermore, at trial, appellee testified that, prior to when the equipment was delivered to appellant in 1998, he stored the equipment on pallets in a weather-proof enclosed steel building.
 {¶ 36} Testimony also was adduced that, once the equipment was delivered to appellant, appellant stored such equipment in an open shed that was exposed to the elements. From 1998 until August 2, 2002, the equipment was exposed to the weather and parts of the same were used to refurbish appellant's own equipment. Finally, there was evidence presented that the value of the equipment when returned to appellee was $5,000.00. Tanks and hydraulic equipment were missing from the same.
 {¶ 37} Based on the foregoing, we find that the trial court did not err in using appellee's $30,000.00 purchase price as the fair market value of the equipment at the time that the same was delivered to appellant. We concur with appellee that it is "reasonable for the court to find that the purchase price three years earlier,[1] when the equipment was in the same exact condition, would be the value to assess as damages." We further find that the trial court did not err in awarding damages in the amount of $25,000.00 based on testimony that the equipment, when returned to appellee, was worth only $5,000.00.
 {¶ 38} Appellant's sole assignment of error is, therefore, overruled.
 {¶ 39} Accordingly, the judgment of the Guernsey County Court of Common Pleas is affirmed.
Edwards, J., Farmer, P.J. and Wise, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Guernsey County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] The purchase actually occurred four years earlier, in 1994.